# UNITED STATES *v.* JACOBSEN ET AL.

No. 82–1167.   Argued December 7, 1983—Decided April 2, 1984

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in Part III of which WHITE, J., joined. WHITE, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 126. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 133.

*David A. Strauss* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *Joel M. Gershowitz.*

*Mark W. Peterson* argued the cause and filed a brief for respondents.*

---

*\*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Howard G. Berringer, David Crump, Daniel B. Hales, William B. Randall,* and *Evelle J. Younger* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

*John Kenneth Zwerling* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

JUSTICE STEVENS delivered the opinion of the Court.

During their examination of a damaged package, the employees of a private freight carrier observed a white powdery substance, originally concealed within eight layers of wrappings. They summoned a federal agent, who removed a trace of the powder, subjected it to a chemical test and determined that it was cocaine. The question presented is whether the Fourth Amendment required the agent to obtain a warrant before he did so.

The relevant facts are not in dispute. Early in the morning of May 1, 1981, a supervisor at the Minneapolis-St. Paul Airport Federal Express office asked the office manager to look at a package that had been damaged and torn by a forklift. They then opened the package in order to examine its contents pursuant to a written company policy regarding insurance claims.

The container was an ordinary cardboard box wrapped in brown paper. Inside the box five or six pieces of crumpled newspaper covered a tube about 10 inches long; the tube was made of the silver tape used on basement ducts. The supervisor and office manager cut open the tube, and found a series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing about six and a half ounces of white powder. When they observed the white powder in the innermost bag, they notified the Drug Enforcement Administration. Before the first DEA agent arrived, they replaced the plastic bags in the tube and put the tube and the newspapers back into the box.

When the first federal agent arrived, the box, still wrapped in brown paper, but with a hole punched in its side and the top open, was placed on a desk. The agent saw that one end of the tube had been slit open; he removed the four plastic bags from the tube and saw the white powder. He then opened each of the four bags and removed a trace of the

white substance with a knife blade. A field test made on the spot identified the substance as cocaine.[1]

In due course, other agents arrived, made a second field test, rewrapped the package, obtained a warrant to search the place to which it was addressed, executed the warrant, and arrested respondents. After they were indicted for the crime of possessing an illegal substance with intent to distribute, their motion to suppress the evidence on the ground that the warrant was the product of an illegal search and seizure was denied; they were tried and convicted, and appealed. The Court of Appeals reversed. 683 F. 2d 296 (CA8 1982). It held that the validity of the search warrant depended on the validity of the agents' warrantless test of the white powder,[2] that the testing constituted a significant expansion of the earlier private search, and that a warrant was required.

As the Court of Appeals recognized, its decision conflicted with a decision of another Court of Appeals on comparable facts, *United States* v. *Barry*, 673 F. 2d 912 (CA6), cert. denied, 459 U. S. 927 (1982).[3] For that reason, and because

---

[1] As the test is described in the evidence, it involved the use of three test tubes. When a substance containing cocaine is placed in one test tube after another, it will cause liquids to take on a certain sequence of colors. Such a test discloses whether or not the substance is cocaine, but there is no evidence that it would identify any other substances.

[2] The Court of Appeals did not hold that the facts would not have justified the issuance of a warrant without reference to the test results; the court merely held that the facts recited in the warrant application, which relied almost entirely on the results of the field tests, would not support the issuance of the warrant if the field test was itself unlawful. " 'It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention.' " *Spinelli* v. *United States*, 393 U. S. 410, 413, n. 3 (1969) (emphasis in original) (quoting *Aguilar* v. *Texas*, 378 U. S. 108, 109, n. 1 (1964)). See *Illinois* v. *Gates*, 462 U. S. 213, 238–239 (1983).

[3] See also *People* v. *Adler*, 50 N. Y. 2d 730, 409 N. E. 2d 888, cert. denied, 449 U. S. 1014 (1980); cf. *United States* v. *Andrews*, 618 F. 2d 646 (CA10) (upholding warrantless field test without discussion), cert. denied, 449 U. S. 824 (1980).

field tests play an important role in the enforcement of the narcotics laws, we granted certiorari, 460 U. S. 1021.

## I

The first Clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." This text protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.[4] A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.[5] This Court has also consistently construed this protection as proscribing only governmental action; it is wholly inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Walter* v.

---

[4] See *Illinois* v. *Andreas*, 463 U. S. 765, 771 (1983); *United States* v. *Knotts*, 460 U. S. 276, 280–281 (1983); *Smith* v. *Maryland*, 442 U. S. 735, 739–741 (1979); *Terry* v. *Ohio*, 392 U. S. 1, 9 (1968).

[5] See *United States* v. *Place*, 462 U. S. 696 (1983); *id.*, at 716 (BRENNAN, J., concurring in result); *Texas* v. *Brown*, 460 U. S. 730, 747–748 (1983) (STEVENS, J., concurring in judgment); see also *United States* v. *Chadwick*, 433 U. S. 1, 13–14, n. 8 (1977); *Hale* v. *Henkel*, 201 U. S. 43, 76 (1906). While the concept of a "seizure" of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the "seizure" of a person within the meaning of the Fourth Amendment— meaningful interference, however brief, with an individual's freedom of movement. See *Michigan* v. *Summers*, 452 U. S. 692, 696 (1981); *Reid* v. *Georgia*, 448 U. S. 438, 440, n. (1980) *(per curiam); United States* v. *Mendenhall*, 446 U. S. 544, 551–554 (1980) (opinion of Stewart, J.); *Brown* v. *Texas*, 443 U. S. 47, 50 (1979); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975); *Cupp* v. *Murphy*, 412 U. S. 291, 294–295 (1973); *Davis* v. *Mississippi*, 394 U. S. 721, 726–727 (1969); *Terry* v. *Ohio*, 392 U. S., at 16, 19, n. 16.

*United States*, 447 U. S. 649, 662 (1980) (BLACKMUN, J., dissenting).[6]

When the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an "effect" within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable.[7] Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.[8] Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.[9] Conversely, in this case the fact that agents of the private carrier independently opened the package and made an examination that might have been impermissible for a government agent

---

[6] See 447 U. S., at 656 (opinion of STEVENS, J.); *id.*, at 660–661 (WHITE, J., concurring in part and concurring in judgment); *United States* v. *Janis*, 428 U. S. 433, 455–456, n. 31 (1976); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 487–490 (1971); *Burdeau* v. *McDowell*, 256 U. S. 465 (1921).

[7] *United States* v. *Chadwick*, 433 U. S. 1, 10 (1977); *United States* v. *Van Leeuwen*, 397 U. S. 249, 251 (1970); *Ex parte Jackson*, 96 U. S. 727, 733 (1878); see also *Walter*, 447 U. S., at 654–655 (opinion of STEVENS, J.).

[8] See, *e. g.*, *United States* v. *Place*, 462 U. S., at 701; *United States* v. *Ross*, 456 U. S. 798, 809–812 (1982); *Robbins* v. *California*, 453 U. S. 420, 426 (1981) (plurality opinion); *Arkansas* v. *Sanders*, 442 U. S. 753, 762 (1979); *United States* v. *Chadwick*, 433 U. S., at 13, and n. 8; *United States* v. *Van Leeuwen, supra.* There is, of course, a well-recognized exception for customs searches; but that exception is not involved in this case.

[9] See *Whiteley* v. *Warden*, 401 U. S. 560, 567, n. 11 (1971); *Wong Sun* v. *United States*, 371 U. S. 471, 484 (1963); *Rios* v. *United States*, 364 U. S. 253, 261–262 (1960); *Henry* v. *United States*, 361 U. S. 98, 103 (1959); *Miller* v. *United States*, 357 U. S. 301, 312 (1958); *United States* v. *Di Re*, 332 U. S. 581, 595 (1948); *Byars* v. *United States*, 273 U. S. 28, 29 (1927).

cannot render otherwise reasonable official conduct unreasonable. The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred.

The initial invasions of respondents' package were occasioned by private action. Those invasions revealed that the package contained only one significant item, a suspicious looking tape tube. Cutting the end of the tube and extracting its contents revealed a suspicious looking plastic bag of white powder. Whether those invasions were accidental or deliberate,[10] and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character.

The additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search. That standard was adopted by a majority of the Court in *Walter* v. *United States*, *supra*. In *Walter* a private party had opened a misdirected carton, found rolls of motion picture films that appeared to be contraband, and turned the carton over to the Federal Bureau of Investigation. Later, without obtaining a warrant, FBI agents obtained a projector and viewed the films. While there was no single opinion of the Court, a majority did agree on the appropriate analysis of a governmental search which follows on the heels of a private one. Two Justices took the position:

"If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any offi-

---

[10] A post-trial affidavit indicates that an agent of Federal Express may have opened the package because he was suspicious about its contents, and not because of damage from a forklift. However, the lower courts found no governmental involvement in the private search, a finding not challenged by respondents. The affidavit thus is of no relevance to the issue we decide.

cial use of a private party's invasion of another person's privacy. Even though some circumstances—for example, if the results of the private search are in plain view when materials are turned over to the Government—may justify the Government's reexamination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search. In these cases, the private party had not actually viewed the films. Prior to the Government screening, one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search." *Id.*, at 657 (opinion of STEVENS, J., joined by Stewart, J.) (footnote omitted).[11]

Four additional Justices, while disagreeing with this characterization of the scope of the private search, were also of the view that the legality of the governmental search must be tested by the scope of the antecedent private search.

"'Under these circumstances, since the L'Eggs employees so fully ascertained the nature of the films before contacting the authorities, we find that the FBI's subsequent viewing of the movies on a projector did not "change the nature of the search" and was not an additional search subject to the warrant requirement.'" *Id.*, at 663–664 (BLACKMUN, J., dissenting, joined by BURGER, C. J., and POWELL and REHNQUIST, JJ.) (footnote omitted) (quoting *United States* v. *Sanders*, 592

---

[11] See also 447 U. S., at 658–659 (footnotes omitted) ("The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection").

F. 2d 788, 793–794 (CA5 1979) (case below in *Walter*).[12]

This standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities. It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information: "This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed." *United States* v. *Miller*, 425 U. S. 435, 443 (1976).[13] The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a pri-

---

[12] In *Walter*, a majority of the Court found a violation of the Fourth Amendment. For present purposes, the disagreement between the majority and the dissenters in that case with respect to the comparison between the private search and the official search is less significant than the agreement on the standard to be applied in evaluating the relationship between the two searches.

[13] See *Smith* v. *Maryland*, 442 U. S. 735, 743–744 (1979); *United States* v. *White*, 401 U. S. 745, 749–753 (1971) (plurality opinion); *Osborn* v. *United States*, 385 U. S. 323, 326–331 (1966); *Hoffa* v. *United States*, 385 U. S. 293, 300–303 (1966); *Lewis* v. *United States*, 385 U. S. 206 (1966); *Lopez* v. *United States*, 373 U. S. 427, 437–439 (1963); *On Lee* v. *United States*, 343 U. S. 747, 753–754 (1952). See also *United States* v. *Henry*, 447 U. S. 264, 272 (1980); *United States* v. *Caceres*, 440 U. S. 741, 744, 750–751 (1979).

vate search, and therefore presumptively violate the Fourth Amendment if they act without a warrant.[14]

In this case, the federal agents' invasions of respondents' privacy involved two steps: first, they removed the tube from the box, the plastic bags from the tube, and a trace of powder from the innermost bag; second, they made a chemical test of the powder. Although we ultimately conclude that both actions were reasonable for essentially the same reason, it is useful to discuss them separately.

## II

When the first federal agent on the scene initially saw the package, he knew it contained nothing of significance except a tube containing plastic bags and, ultimately, white powder. It is not entirely clear that the powder was visible to him before he removed the tube from the box.[15] Even if the white

---

[14] See *Katz* v. *United States*, 389 U. S. 347 (1967); *Berger* v. *New York*, 388 U. S. 41 (1967); *Silverman* v. *United States*, 365 U. S. 505 (1961).

[15] Daniel Stegemoller, the Federal Express office manager, testified at the suppression hearing that the white substance was not visible without reentering the package at the time the first agent arrived. App. 42–43, 58. As JUSTICE WHITE points out, the Magistrate found that the "tube was in plain view in the box and the bags with the white powder were visible from the end of the tube." App. to Pet. for Cert. 18a. The bags were, however, only visible if one picked up the tube and peered inside through a small aperture; even then, what was visible was only the translucent bag that contained the white powder. The powder itself was barely visible, and surely was not so plainly in view that the agents did "no more than fail to avert their eyes," *post*, at 130. In any event, respondents filed objections to the Magistrate's report with the District Court. The District Court declined to resolve respondents' objections, ruling that fact immaterial and assuming for purposes of its decision "that the newspaper in the box covered the gray tube and that neither the gray tube nor the contraband could be seen when the box was turned over to the . . . DEA agents." App. to Pet. for Cert. 12a–13a. At trial, the federal agent first on the scene testified that the powder was not visible until after he pulled the plastic bags out of the tube. App. 71–72. Respondents continue to argue this case on the assumption that the Magistrate's report is incorrect. Brief for Respondents 2–3. As our discussion will make clear, we agree with the

powder was not itself in "plain view" because it was still en-
closed in so many containers and covered with papers, there
was a virtual certainty that nothing else of significance was in
the package and that a manual inspection of the tube and its
contents would not tell him anything more than he already
had been told.   Respondents do not dispute that the Govern-
ment could utilize the Federal Express employees' testimony
concerning the contents of the package.   If that is the case, it
hardly infringed respondents' privacy for the agents to re-
examine the contents of the open package by brushing aside a
crumpled newspaper and picking up the tube.   The advan-
tage the Government gained thereby was merely avoiding
the risk of a flaw in the employees' recollection, rather than
in further infringing respondents' privacy.   Protecting the
risk of misdescription hardly enhances any legitimate privacy
interest, and is not protected by the Fourth Amendment.[16]
Respondents could have no privacy interest in the contents
of the package, since it remained unsealed and since the Fed-
eral Express employees had just examined the package and
had, of their own accord, invited the federal agent to their
offices for the express purpose of viewing its contents.   The
agent's viewing of what a private party had freely made
available for his inspection did not violate the Fourth Amend-

District Court that it does not matter whether the loose pieces of news-
paper covered the tube at the time the agent first saw the box.

[16] See *United States* v. *Caceres,* 440 U. S., at 750–751; *United States* v.
*White,* 401 U. S., at 749–753 (plurality opinion); *Osborn* v. *United States,*
385 U. S., at 326–331; *On Lee* v. *United States,* 343 U. S., at 753–754.
For example, in *Lopez* v. *United States,* 373 U. S. 427 (1963), the Court
wrote: "Stripped to its essentials, petitioner's argument amounts to saying
that he has a constitutional right to rely on possible flaws in the agent's
memory, or to challenge the agent's credibility without being beset by
corroborating evidence . . . .   For no other argument can justify excluding
an accurate version of a conversation that the agent could testify to from
memory.   We think the risk that petitioner took in offering a bribe to
Davis fairly included the risk that the offer would be accurately reproduced
in court . . . ."   *Id.,* at 439 (footnote omitted).

ment. See *Coolidge* v. *New Hampshire*, 403 U. S. 443, 487–490 (1971); *Burdeau* v. *McDowell*, 256 U. S. 465, 475–476 (1921).

Similarly, the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.[17]  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

While the agents' assertion of dominion and control over the package and its contents did constitute a "seizure,"[18] that

---

[17] We reject JUSTICE WHITE's suggestion that this case is indistinguishable from one in which the police simply learn from a private party that a container contains contraband, seize it from its owner, and conduct a warrantless search which, as JUSTICE WHITE properly observes, would be unconstitutional.  Here, the Federal Express employees who were lawfully in possession of the package invited the agent to examine its contents; the governmental conduct was made possible only because private parties had compromised the integrity of this container.  JUSTICE WHITE would have this case turn on the fortuity of whether the Federal Express employees placed the tube back into the box.  But in the context of their previous examination of the package, their communication of what they had learned to the agent, and their offer to have the agent inspect it, that act surely could not create any privacy interest with respect to the package that would not otherwise exist.  See *Illinois* v. *Andreas*, 463 U. S., at 771–772. Thus the precise character of the white powder's visibility to the naked eye is far less significant than the facts that the container could no longer support any expectation of privacy, and that it was virtually certain that it contained nothing but contraband.  Contrary to JUSTICE WHITE's suggestion, we do not "sanctio[n] warrantless searches of closed or covered containers or packages whenever probable cause exists as a result of a prior private search."  *Post*, at 129.  A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant.  See *United States* v. *Ross*, 456 U. S., at 809–812; *Robbins* v. *California*, 453 U. S., at 426–427 (plurality opinion); *Arkansas* v. *Sanders*, 442 U. S., at 764–765; *United States* v. *Chadwick*, 433 U. S. 1 (1977).

[18] Both the Magistrate and the District Court found that the agents took custody of the package from Federal Express after they arrived.  Al-

seizure was not unreasonable. The fact that, prior to the field test, respondents' privacy interest in the contents of the package had been largely compromised is highly relevant to the reasonableness of the agents' conduct in this respect. The agents had already learned a great deal about the contents of the package from the Federal Express employees, all of which was consistent with what they could see. The package itself, which had previously been opened, remained unsealed, and the Federal Express employees had invited the agents to examine its contents. Under these circumstances, the package could no longer support any expectation of privacy; it was just like a balloon "the distinctive character [of which] spoke volumes as to its contents—particularly to the trained eye of the officer," *Texas* v. *Brown*, 460 U. S. 730, 743 (1983) (plurality opinion); see also *id.*, at 746 (POWELL, J., concurring in judgment); or the hypothetical gun case in *Arkansas* v. *Sanders*, 442 U. S. 753, 764–765, n. 13 (1979). Such containers may be seized, at least temporarily, without a warrant.[19] Accordingly, since it was apparent that the tube and plastic bags contained contraband and little else, this warrantless seizure was reasonable,[20] for it is well settled that it is constitutionally reasonable for law enforcement officials to seize "effects" that cannot support a justifiable expec-

though respondents had entrusted possession of the items to Federal Express, the decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a "seizure," though not necessarily an unreasonable one. See *United States* v. *Van Leeuwen*, 397 U. S. 249 (1970). Indeed, this is one thing on which the entire Court appeared to agree in *Walter* v. *United States*, 447 U. S. 649 (1980).

[19] See also *United States* v. *Ross*, 456 U. S., at 822–823; *Robbins* v. *California*, 453 U. S., at 428 (plurality opinion).

[20] Respondents concede that the agents had probable cause to believe the package contained contraband. Therefore we need not decide whether the agents could have seized the package based on something less than probable cause. Some seizures can be justified by an articulable suspicion of criminal activity. See *United States* v. *Place*, 462 U. S. 696 (1983).

tation of privacy without a warrant, based on probable cause to believe they contain contraband.[21]

## III

The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express employees and therefore exceeded the scope of the private search, was an unlawful "search" or "seizure" within the meaning of the Fourth Amendment.

The field test at issue could disclose only one fact previously unknown to the agent—whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment—did it infringe an expectation of privacy that society is prepared to consider reasonable?

The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.[22] Indeed, this distinction underlies the rule that

---

[21] See *Place*, 462 U. S., at 701–702; *Texas* v. *Brown*, 460 U. S., at 741–742 (plurality opinion); *id.*, at 748 (STEVENS, J., concurring in judgment); *Payton* v. *New York*, 445 U. S. 573, 587 (1980); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 354 (1977); *Harris* v. *United States*, 390 U. S. 234, 236 (1968) *(per curiam)*.

[22] "Obviously, however, a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' His presence, in the words of *Jones* [v. *United States*, 362 U. S. 257, 267 (1960)], is 'wrongful'; his expectation [of privacy] is not 'one that society is prepared to recognize as "reasonable." ' *Katz* v. *United States*, 389 U. S., at 361 (Harlan, J., concurring). And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside

government may utilize information voluntarily disclosed to a governmental informant, despite the criminal's reasonable expectation that his associates would not disclose confidential information to the authorities. See *United States* v. *White*, 401 U. S. 745, 751–752 (1971) (plurality opinion).

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative—merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest. Congress has decided—and there is no question about its power to do so—to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.[23]

This conclusion is dictated by *United States* v. *Place*, 462 U. S. 696 (1983), in which the Court held that subjecting luggage to a "sniff test" by a trained narcotics detection dog was not a "search" within the meaning of the Fourth Amendment:

---

of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas* v. *Illinois*, 439 U. S. 128, 143–144, n. 12 (1978). See also *United States* v. *Knotts*, 460 U. S. 276 (1983) (use of a beeper to track car's movements infringed no reasonable expectation of privacy); *Smith* v. *Maryland*, 442 U. S. 735 (1979) (use of a pen register to record phone numbers dialed infringed no reasonable expectation of privacy).

[23] See Loewy, The Fourth Amendment as a Device for Protecting the Innocent, 81 Mich. L. Rev. 1229 (1983). Our discussion, of course, is confined to possession of contraband. It is not necessarily the case that the purely "private" possession of an article that cannot be distributed in commerce is itself illegitimate. See *Stanley* v. *Georgia*, 394 U. S. 557 (1969).

"A 'canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited." *Id.*, at 707.[24]

Here, as in *Place*, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

We have concluded, in Part II, *supra*, that the initial "seizure" of the package and its contents was reasonable. Nevertheless, as *Place* also holds, a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the the Fourth Amendment's prohibition on "unreasonable seizures."[25] Here, the field test did affect respondents' possessory interests protected by the Amendment, since by destroying a quantity of the powder it con-

---

[24] Respondents attempt to distinguish *Place*, arguing that it involved no physical invasion of Place's effects, unlike the conduct at issue here. However, as the quotation makes clear, the *reason* this did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items. That rationale is fully applicable here.

[25] In *Place*, the Court held that while the initial seizure of luggage for the purpose of subjecting it to a "dog sniff" test was reasonable, the seizure became unreasonable because its length unduly intruded upon constitutionally protected interests. See *id.*, at 707–710.

verted what had been only a temporary deprivation of possessory interests into a permanent one. To assess the reasonableness of this conduct, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." 462 U. S., at 703.[26]

Applying this test, we conclude that the destruction of the powder during the course of the field test was reasonable. The law enforcement interests justifying the procedure were substantial; the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband. Conversely, because only a trace amount of material was involved, the loss of which appears to have gone unnoticed by respondents, and since the property had already been lawfully detained, the "seizure" could, at most, have only a *de minimis* impact on any protected property interest. Cf. *Cardwell* v. *Lewis*, 417 U. S. 583, 591–592 (1974) (plurality opinion) (examination of automobile's tires and taking of paint scrapings was a *de minimis* invasion of constitutional interests).[27] Under these circumstances, the safeguards of a warrant would only minimally advance Fourth Amendment interests. This warrantless "seizure" was reasonable.[28]

---

[26] See, *e. g.*, *Michigan* v. *Long*, 463 U. S. 1032, 1046–1047 (1983); *Delaware* v. *Prouse*, 440 U. S. 648, 654 (1979); *United States* v. *Brignoni-Ponce*, 422 U. S., at 878; *Terry* v. *Ohio*, 392 U. S., at 20–21; *Camara* v. *Municipal Court*, 387 U. S. 523, 536–537 (1967).

[27] In fact, respondents do not contend that the amount of material tested was large enough to make it possible for them to have detected its loss. The only description in the record of the amount of cocaine seized is that "[i]t was a trace amount." App. 75.

[28] See *Cupp* v. *Murphy*, 412 U. S. 291, 296 (1973) (warrantless search and seizure limited to scraping suspect's fingernails justified even when full search may not be). Cf. *Place*, 462 U. S., at 703–706 (approving brief warrantless seizure of luggage for purposes of "sniff test" based on its minimal intrusiveness and reasonable belief that the luggage contained contraband); *United States* v. *Van Leeuwen*, 397 U. S., at 252–253 (detention of package on reasonable suspicion was justified since detention infringed no

126

In sum, the federal agents did not infringe any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct.   To the extent that a protected possessory interest was infringed, the infringement was *de minimis* and constitutionally reasonable. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE, concurring in part and concurring in the judgment.

It is relatively easy for me to concur in the judgment in this case, since in my view the case should be judged on the basis of the Magistrate's finding that, when the first DEA agent arrived, the "tube was in plain view in the box and the bags with the white powder were visible from the end of the tube."   App. to Pet. for Cert. 18a.   Although this finding was challenged before the District Court, that court found it unnecessary to pass on the issue.   *Id.*, at 12a–13a.   As I understand its opinion, however, the Court of Appeals accepted the Magistrate's finding: the Federal Express manager "placed the bags back in the tube, leaving them visible from the tube's end, and placed the tube back in the box"; he later gave the box to the DEA agent, who "removed the tube from the open box, took the bags out of the tube, and extracted a sample of the powder."   683 F. 2d 296, 297 (CA8 1982).   At the very least, the Court of Appeals assumed that

---

"significant Fourth Amendment interest").   Of course, where more substantial invasions of constitutionally protected interests are involved, a warrantless search or seizure is unreasonable in the absence of exigent circumstances.   See, *e. g., Steagald* v. *United States,* 451 U. S. 204 (1981); *Payton* v. *New York,* 445 U. S. 573 (1980); *Dunaway* v. *New York,* 442 U. S. 200 (1979); *United States* v. *Chadwick,* 433 U. S. 1 (1977).   We do not suggest, however, that any seizure of a small amount of material is necessarily reasonable.   An agent's arbitrary decision to take the "white powder" he finds in a neighbor's sugar bowl, or his medicine cabinet, and subject it to a field test for cocaine, might well work an unreasonable seizure.

the contraband was in plain view. The Court of Appeals then proceeded to consider whether the federal agent's field test was an illegal extension of the private search, and it invalidated the field test solely for that reason.

Particularly since respondents argue here that whether or not the contraband was in plain view when the federal agent arrived is irrelevant and that the only issue is the validity of the field test, see, *e. g.*, Brief for Respondents 25, n. 11; Tr. of Oral Arg. 28, I would proceed on the basis that the clear plastic bags were in plain view when the agent arrived and that the agent thus properly observed the suspected contraband. On that basis, I agree with the Court's conclusion in Part III that the Court of Appeals erred in holding that the type of chemical test conducted here violated the Fourth Amendment.

The Court, however, would not read the Court of Appeals' opinion as having accepted the Magistrate's finding. It refuses to assume that the suspected contraband was visible when the first DEA agent arrived on the scene, conducts its own examination of the record, and devotes a major portion of its opinion to a discussion that would be unnecessary if the facts were as found by the Magistrate. The Court holds that even if the bags were not visible when the agent arrived, his removal of the tube from the box and the plastic bags from the tube and his subsequent visual examination of the bags' contents "infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment" because these actions "enabled the agent to learn nothing that had not previously been learned during the private search." *Ante*, at 120 (footnote omitted). I disagree with the Court's approach for several reasons.

First, as I have already said, respondents have abandoned any attack on the Magistrate's findings; they assert that it is irrelevant whether the suspected contraband was in plain view when the first DEA agent arrived and argue only that the plastic bags could not be opened and their contents tested

without a warrant. In short, they challenge only the expansion of the private search, place no reliance on the fact that the plastic bags containing the suspected contraband might not have been left in plain view by the private searchers, and do not contend that their Fourth Amendment rights were violated by the duplication of the private search they alleged in the District Court was necessitated by the condition to which the private searchers returned the package. In these circumstances, it would be the better course for the Court to decide the case on the basis of the facts found by the Magistrate and not rejected by the Court of Appeals, to consider only whether the alleged expansion of the private search by the field test violated the Fourth Amendment, and to leave for another day the question whether federal agents could have duplicated the prior private search had that search not left the contraband in plain view.

Second, if the Court feels that the Magistrate may have erred in concluding that the white powder was in plain view when the first agent arrived and believes that respondents have not abandoned their challenge to the agent's duplication of the prior private search, it nevertheless errs in responding to that challenge. The task of reviewing the Magistrate's findings belongs to the District Court and the Court of Appeals in the first instance. We should request that they perform that function, particularly since if the Magistrate's finding that the contraband was in plain view when the federal agent arrived were to be sustained, there would be no need to address the difficult constitutional question decided today. The better course, therefore, would be to remand the case after rejecting the Court of Appeals' decision invalidating the field test as an illegal expansion of the private search.

Third, if this case must be judged on the basis that the plastic bags and their contents were concealed when the first agent arrived, I disagree with the Court's conclusion that the agent could, without a warrant, uncover or unwrap the tube

and remove its contents simply because a private party had previously done so. The remainder of this opinion will address this issue.

The governing principles with respect to the constitutional protection afforded closed containers and packages may be readily discerned from our cases. The Court has consistently rejected proposed distinctions between worthy and unworthy containers and packages, *United States* v. *Ross*, 456 U. S. 798, 815, 822–823 (1982); *Robbins* v. *California*, 453 U. S. 420, 425–426 (1981) (plurality opinion), and has made clear that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view" and does not otherwise unmistakably reveal its contents. *United States* v. *Ross, supra,* at 822–823; see *Robbins* v. *California, supra,* at 427–428 (plurality opinion); *Arkansas* v. *Sanders,* 442 U. S. 753, 764, n. 13 (1979). Although law enforcement officers may sometimes seize such containers and packages pending issuance of warrants to examine their contents, *United States* v. *Place,* 462 U. S. 696, 701 (1983); *Texas* v. *Brown,* 460 U. S. 730, 749–750 (1983) (STEVENS, J., concurring in judgment), the mere existence of probable cause to believe that a container or package contains contraband plainly cannot justify a warrantless examination of its contents. *Ante,* at 114; *United States* v. *Ross, supra,* at 809–812; *Arkansas* v. *Sanders, supra,* at 762; *United States* v. *Chadwick,* 433 U. S. 1, 13, and n. 8 (1977).

This well-established prohibition of warrantless searches has applied notwithstanding the manner in which the police obtained probable cause. The Court now for the first time sanctions warrantless searches of closed or covered containers or packages whenever probable cause exists as a result of a prior private search. It declares, in fact, that governmental inspections following on the heels of private searches are not searches at all as long as the police do no more than the private parties have already done. In reaching this conclusion, the Court excessively expands our prior decisions rec-

ognizing that the Fourth Amendment proscribes only governmental action. *Burdeau* v. *McDowell*, 256 U. S. 465 (1921); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 487–490 (1971).

As the Court observes, the Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Ante*, at 113 (quoting *Walter* v. *United States*, 447 U. S. 649, 662 (1980) (BLACKMUN, J., dissenting)). Where a private party has revealed to the police information he has obtained during a private search or exposed the results of his search to plain view, no Fourth Amendment interest is implicated because the police have done no more than fail to avert their eyes. *Coolidge* v. *New Hampshire, supra*, at 489.

The private-search doctrine thus has much in common with the plain-view doctrine, which is "grounded on the proposition that once police are lawfully in a position *to observe an item firsthand,* its owner's privacy interest in that item is lost . . . ." *Illinois* v. *Andreas*, 463 U. S. 765, 771 (1983) (emphasis added). It also shares many of the doctrinal underpinnings of cases establishing that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities," *United States* v. *Miller*, 425 U. S. 435, 443 (1976), although the analogy is imperfect since the risks assumed by a person whose belongings are subjected to a private search are not comparable to those assumed by one who voluntarily chooses to reveal his secrets to a companion.

Undoubtedly, the fact that a private party has conducted a search "that might have been impermissible for a government agent cannot render otherwise reasonable official conduct unreasonable." *Ante*, at 114–115. But the fact that a repository of personal property previously was searched by a private party has never been used to legitimize *governmental conduct* that otherwise would be subject to challenge under

the Fourth Amendment. If government agents are unwilling or unable to rely on information or testimony provided by a private party concerning the results of a private search and that search has not left incriminating evidence in plain view, the agents may wish to duplicate the private search to observe firsthand what the private party has related to them or to examine and seize the suspected contraband the existence of which has been reported. The information provided by the private party clearly would give the agents probable cause to secure a warrant authorizing such actions. Nothing in our previous cases suggests, however, that the agents may proceed to conduct their own search of the same or lesser scope as the private search without first obtaining a warrant. *Walter* v. *United States, supra,* at 660–662 (WHITE, J., concurring in part and concurring in judgment).

*Walter* v. *United States,* on which the majority heavily relies in opining that "[t]he additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search," *ante,* at 115, does not require that conclusion. JUSTICE STEVENS' opinion in *Walter* does contain language suggesting that the government is free to do all of what was done earlier by the private searchers. But this language was unnecessary to the decision, as JUSTICE STEVENS himself recognized in leaving open the question whether "the Government would have been required to obtain a warrant had the private party been the first to view [the films]," 447 U. S., at 657, n. 9, and in emphasizing that "[e]ven though some circumstances—for example, *if the results of the private search are in plain view when materials are turned over to the Government*—may justify the Government's reexamination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search." *Id.,* at 657 (emphasis added). Nor does JUSTICE BLACKMUN's dissent in *Walter* necessarily support today's holding, for it emphasized that the opened con-

tainers turned over to the Government agents "clearly revealed the nature of their contents," *id.*, at 663; see *id.*, at 665, and the facts of this case, at least as viewed by the Court, do not support such a conclusion.

Today's decision also is not supported by the majority's reference to cases involving the transmission of previously private information to the police by a third party who has been made privy to that information. *Ante*, at 117–118. The police may, to be sure, use confidences revealed to them by a third party to establish probable cause or for other purposes, and the third party may testify about those confidences at trial without violating the Fourth Amendment. But we have never intimated until now that an individual who reveals that he stores contraband in a particular container or location to an acquaintance who later betrays his confidence has no expectation of privacy in that container or location and that the police may thus search it without a warrant.

That, I believe, is the effect of the Court's opinion. If a private party breaks into a locked suitcase, a locked car, or even a locked house, observes incriminating information, returns the object of his search to its prior locked condition, and then reports his findings to the police, the majority apparently would allow the police to duplicate the prior search on the ground that the private search vitiated the owner's expectation of privacy. As JUSTICE STEVENS has previously observed, this conclusion cannot rest on the proposition that the owner no longer has a subjective expectation of privacy since a person's expectation of privacy cannot be altered by subsequent events of which he was unaware. *Walter* v. *United States, supra,* at 659, n. 12.

The majority now ignores an individual's subjective expectations and suggests that "[t]he reasonableness of an official invasion of a citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Ante*, at 115. On that view, however, the reasonableness of a particular individual's remaining expectation of privacy should turn entirely on whether the private

search left incriminating evidence or contraband in plain view. Cf. *Walter* v. *United States, supra,* at 663, 665 (BLACKMUN, J., dissenting). If the evidence or contraband is not in plain view and not in a container that clearly announces its contents at the end of a private search, the government's subsequent examination of the previously searched object necessarily constitutes an independent, governmental search that infringes Fourth Amendment privacy interests. 447 U. S., at 662 (WHITE, J., concurring in part and concurring in judgment).

The majority opinion is particularly troubling when one considers its logical implications. I would be hard-pressed to distinguish this case, which involves a private search, from (1) one in which the private party's knowledge, later communicated to the government, that a particular container concealed contraband and nothing else arose from his presence at the time the container was sealed; (2) one in which the private party learned that a container concealed contraband and nothing else when it was previously opened in his presence; or (3) one in which the private party knew to a certainty that a container concealed contraband and nothing else as a result of conversations with its owner. In each of these cases, the approach adopted by the Court today would seem to suggest that the owner of the container has no legitimate expectation of privacy in its contents and that government agents opening that container without a warrant on the strength of information provided by the private party would not violate the Fourth Amendment.

Because I cannot accept the majority's novel extension of the private-search doctrine and its implications for the entire concept of legitimate expectations of privacy, I concur only in Part III of its opinion and in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

This case presents two questions: first whether law enforcement officers may conduct a warrantless search of the

contents of a container merely because a private party has previously examined the container's contents and informed the officers of its suspicious nature; and second, whether law enforcement officers may conduct a chemical field test of a substance once the officers have legitimately located the substance. Because I disagree with the Court's treatment of each of these issues, I respectfully dissent.

## I

I agree entirely with JUSTICE WHITE that the Court has expanded the reach of the private-search doctrine far beyond its logical bounds. *Ante*, at 127–133 (WHITE, J., concurring in judgment). It is difficult to understand how respondents can be said to have no expectation of privacy in a closed container simply because a private party has previously opened the container and viewed its contents. I also agree with JUSTICE WHITE, however, that if the private party presents the contents of a container to a law enforcement officer in such a manner that the contents are plainly visible, the officer's visual inspection of the contents does not constitute a "search" within the meaning of the Fourth Amendment. Because the record in this case is unclear on the question whether the contents of respondents' package were plainly visible when the Federal Express employee showed the package to the DEA officer, I would remand the case for further factfinding on this central issue.

## II

As noted, I am not persuaded that the DEA officer actually came upon respondents' cocaine without violating the Fourth Amendment and, accordingly, I need not address the legality of the chemical field test. Since the Court has done so, however, I too will address the question, assuming, *arguendo*, that the officer committed neither an unconstitutional search nor an unconstitutional seizure prior to the point at which he took the sample of cocaine out of the plastic bags to conduct the test.

## A

I agree that, under the hypothesized circumstances, the field test in this case was not a search within the meaning of the Fourth Amendment for the following reasons: *First*, the officer came upon the white powder innocently; *second*, under the hypothesized circumstances, respondents could not have had a reasonable expectation of privacy in the chemical identity of the powder because the DEA agents were already able to identify it as contraband with virtual certainty, *Texas v. Brown*, 460 U. S. 730, 750–751 (1983) (STEVENS, J., concurring in judgment); and *third*, the test required the destruction of only a minute quantity of the powder. The Court, however, has reached this conclusion on a much broader ground, relying on two factors alone to support the proposition that the field test was not a search: *First*, the fact that the test revealed only whether or not the substance was cocaine, without providing any further information; and *second*, the assumption that an individual does not have a reasonable expectation of privacy in such a fact.

The Court asserts that its "conclusion is dictated by *United States* v. *Place*," *ante*, at 123, in which the Court stated that a "canine sniff" of a piece of luggage did not constitute a search because it "is much less intrusive than a typical search," and because it "discloses only the presence or absence of narcotics, a contraband item." 462 U. S. 696, 707 (1983). Presumably, the premise of *Place* was that an individual could not have a reasonable expectation of privacy in the presence or absence of narcotics in his luggage. The validity of the canine sniff in that case, however, was neither briefed by the parties nor addressed by the courts below. Indeed, since the Court ultimately held that the defendant's luggage had been impermissibly seized, its discussion of the question was wholly unnecessary to its judgment. In short, as JUSTICE BLACKMUN pointed out at the time, "[t]he Court [was] certainly in no position to consider all the ramifications of this important issue." *Id.*, at 723–724.

Nonetheless, the Court concluded:

> "[T]he canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.*, at 707.

As it turns out, neither the Court's knowledge nor its imagination regarding criminal investigative techniques proved very sophisticated, for within one year we have learned of another investigative procedure that shares with the dog sniff the same defining characteristics that led the Court to suggest that the dog sniff was not a search.

Before continuing along the course that the Court so hastily charted in *Place*, it is only prudent to take this opportunity—in my view, the first real opportunity—to consider the implications of the Court's new Fourth Amendment jurisprudence. Indeed, in light of what these two cases have taught us about contemporary law enforcement methods, it is particularly important that we analyze the basis upon which the Court has redefined the term "search" to exclude a broad class of surveillance techniques. In my view, such an analysis demonstrates that, although the Court's conclusion is correct in this case, its dictum in *Place* was dangerously incorrect. More important, however, the Court's reasoning in both cases is fundamentally misguided and could potentially lead to the development of a doctrine wholly at odds with the principles embodied in the Fourth Amendment.

Because the requirements of the Fourth Amendment apply only to "searches" and "seizures," an investigative technique

that falls within neither category need not be reasonable and may be employed without a warrant and without probable cause, regardless of the circumstances surrounding its use. The prohibitions of the Fourth Amendment are not, however, limited to any preconceived conceptions of what constitutes a search or a seizure; instead we must apply the constitutional language to modern developments according to the fundamental principles that the Fourth Amendment embodies. *Katz* v. *United States*, 389 U. S. 347 (1967). See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 356 (1974). Before excluding a class of surveillance techniques from the reach of the Fourth Amendment, therefore, we must be certain that none of the techniques so excluded threatens the areas of personal security and privacy that the Amendment is intended to protect.

What is most startling about the Court's interpretation of the term "search," both in this case and in *Place,* is its exclusive focus on the nature of the information or item sought and revealed through the use of a surveillance technique, rather than on the context in which the information or item is concealed. Combining this approach with the blanket assumption, implicit in *Place* and explicit in this case, that individuals in our society have no reasonable expectation of privacy in the fact that they have contraband in their possession, the Court adopts a general rule that a surveillance technique does not constitute a search if it reveals only whether or not an individual possesses contraband.

It is certainly true that a surveillance technique that identifies only the presence or absence of contraband is less intrusive than a technique that reveals the precise nature of an item regardless of whether it is contraband. But by seizing upon this distinction alone to conclude that the first type of technique, as a general matter, is not a search, the Court has foreclosed any consideration of the circumstances under which the technique is used, and may very well have paved

the way for technology to override the limits of law in the area of criminal investigation.

For example, under the Court's analysis in these cases, law enforcement officers could release a trained cocaine-sensitive dog—to paraphrase the California Court of Appeal, a "canine cocaine connoisseur"—to roam the streets at random, alerting the officers to people carrying cocaine. Cf. *People* v. *Evans*, 65 Cal. App. 3d 924, 932, 134 Cal. Rptr. 436, 440 (1977). Or, if a device were developed that, when aimed at a person, would detect instantaneously whether the person is carrying cocaine, there would be no Fourth Amendment bar, under the Court's approach, to the police setting up such a device on a street corner and scanning all passersby. In fact, the Court's analysis is so unbounded that if a device were developed that could detect, from the outside of a building, the presence of cocaine inside, there would be no constitutional obstacle to the police cruising through a residential neighborhood and using the device to identify all homes in which the drug is present. In short, under the interpretation of the Fourth Amendment first suggested in *Place* and first applied in this case, these surveillance techniques would not constitute searches and therefore could be freely pursued whenever and wherever law enforcement officers desire. Hence, at some point in the future, if the Court stands by the theory it has adopted today, search warrants, probable cause, and even "reasonable suspicion" may very well become notions of the past. Fortunately, we know from precedents such as *Katz* v. *United States*, *supra*, overruling the "trespass" doctrine of *Goldman* v. *United States*, 316 U. S. 129 (1942), and *Olmstead* v. *United States*, 277 U. S. 438 (1928), that this Court ultimately stands ready to prevent this Orwellian world from coming to pass.

Although the Court accepts, as it must, the fundamental proposition that an investigative technique is a search within the meaning of the Fourth Amendment if it intrudes upon a privacy expectation that society considers to be reasonable,

*ante*, at 113, the Court has entirely omitted from its discussion the considerations that have always guided our decisions in this area. In determining whether a reasonable expectation of privacy has been violated, we have always looked to the context in which an item is concealed, not to the identity of the concealed item. Thus in cases involving searches for physical items, the Court has framed its analysis first in terms of the expectation of privacy that normally attends the location of the item and ultimately in terms of the legitimacy of that expectation. In *United States* v. *Chadwick*, 433 U. S. 1 (1977), for example, we held that "[n]o less than one who locks the doors of his home against intruders, one who safeguards his possessions [by locking them in a footlocker] is due the protection of the Fourth Amendment . . . ." *Id.*, at 11. Our holding was based largely on the observation that, "[b]y placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination." *Ibid.* The Court made the same point in *United States* v. *Ross*, 456 U. S. 798, 822–823 (1982), where it held that the "Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." The fact that a container contains contraband, which indeed it usually does in such cases, has never altered our analysis.

Similarly, in *Katz* v. *United States*, we held that electronic eavesdropping constituted a search under the Fourth Amendment because it violated a reasonable expectation of privacy. In reaching that conclusion, we focused upon the private context in which the conversation in question took place, stating: "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U. S., at 351–352. Again, the fact that the conversations involved in *Katz* were incriminating did not alter our consideration of the

privacy issue. Nor did such a consideration affect our analysis in *Payton* v. *New York*, 445 U. S. 573 (1980), in which we reaffirmed the principle that the home is private even though it may be used to harbor a fugitive.

In sum, until today this Court has always looked to the manner in which an individual has attempted to preserve the private nature of a particular fact before determining whether there is a reasonable expectation of privacy upon which the government may not intrude without substantial justification. And it has always upheld the general conclusion that searches constitute at least "those more extensive intrusions that significantly jeopardize the sense of security which is the paramount concern of Fourth Amendment liberties." *United States* v. *White*, 401 U. S. 745, 786 (1971) (Harlan, J., dissenting).

Nonetheless, adopting the suggestion in *Place*, the Court has veered away from this sound and well-settled approach and has focused instead solely on the product of the would-be search. In so doing, the Court has ignored the fundamental principle that "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light." *Byars* v. *United States*, 273 U. S. 28, 29 (1927). The unfortunate product of this departure from precedent is an undifferentiated rule allowing law enforcement officers free rein in utilizing a potentially broad range of surveillance techniques that reveal only whether or not contraband is present in a particular location. The Court's new rule has rendered irrelevant the circumstances surrounding the use of the technique, the accuracy of the technique, and the privacy interest upon which it intrudes. Furthermore, the Court's rule leaves no room to consider whether the surveillance technique is employed randomly or selectively, a consideration that surely implicates Fourth Amendment concerns. See 2 W. LaFave, Search and Seizure § 2.2(f) (1978). Although a technique that reveals only the presence or absence of illegal

activity intrudes less into the private life of an individual under investigation than more conventional techniques, the fact remains that such a technique does intrude.   In my view, when the investigation intrudes upon a domain over which the individual has a reasonable expectation of privacy, such as his home or a private container, it is plainly a search within the meaning of the Fourth Amendment.   Surely it cannot be that the individual's reasonable expectation of privacy dissipates simply because a sophisticated surveillance technique is employed.

This is not to say that the limited nature of the intrusion has no bearing on the general Fourth Amendment inquiry. Although there are very few exceptions to the general rule that warrantless searches are presumptively unreasonable, the isolated exceptions that do exist are based on a "balancing [of] the need to search against the invasion which the search entails."   *Camara* v. *Municipal Court*, 387 U. S. 523, 537 (1967).   Hence it may be, for example, that the limited intrusion effected by a given surveillance technique renders the employment of the technique, under particular circumstances, a "reasonable" search under the Fourth Amendment.   See *United States* v. *Place*, 462 U. S., at 723 (BLACKMUN, J., concurring in judgment) ("a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry*").   At least under this well-settled approach, the Fourth Amendment inquiry would be broad enough to allow consideration of the method by which a surveillance technique is employed as well as the circumstances attending its use.   More important, however, it is only under this approach that law enforcement procedures, like those involved in this case and in *Place*, may continue to be governed by the safeguards of the Fourth Amendment.

## B

In sum, the question whether the employment of a particular surveillance technique constitutes a search depends on

whether the technique intrudes upon a reasonable expectation of privacy. This inquiry, in turn, depends primarily on the private nature of the area or item subjected to the intrusion.  In cases involving techniques used to locate or identify a physical item, the manner in which a person has attempted to shield the item's existence or identity from public scrutiny will usually be the key to determining whether a reasonable expectation of privacy has been violated.  Accordingly, the use of techniques like the dog sniff at issue in *Place* constitutes a search whenever the police employ such techniques to secure any information about an item that is concealed in a container that we are prepared to view as supporting a reasonable expectation of privacy.  The same would be true if a more technologically sophisticated method were developed to take the place of the dog.

In this case, the chemical field test was used to determine whether certain white powder was cocaine.  Upon visual inspection of the powder in isolation, one could not identify it as cocaine.  In the abstract, therefore, it is possible that an individual could keep the powder in such a way as to preserve a reasonable expectation of privacy in its identity.  For instance, it might be kept in a transparent pharmaceutical vial and disguised as legitimate medicine.  Under those circumstances, the use of a chemical field test would constitute a search.  However, in this case, as hypothesized above, see *supra*, at 134, the context in which the powder was found could not support a reasonable expectation of privacy.  In particular, the substance was found in four plastic bags, which had been inside a tube wrapped with tape and sent to respondents via Federal Express.  It was essentially inconceivable that a legal substance would be packaged in this manner for transport by a common carrier.  Thus, viewing the powder as they did at the offices of Federal Express, the DEA agent could identify it with "virtual certainty"; it was essentially as though the chemical identity of the powder was

plainly visible. See *Texas* v. *Brown*, 460 U. S., at 751 (STE-VENS, J., concurring in judgment). Under these circumstances, therefore, respondents had no reasonable expectation of privacy in the identity of the powder, and the use of the chemical field test did not constitute a "search" violative of the Fourth Amendment.