516 So.2d 415 (1987)
STATE of Louisiana
v.
Juan Jose SANCHEZ
No. 87 KA 0442.
Court of Appeal of Louisiana, First Circuit.
November 10, 1987.
Rehearing Denied January 7, 1988.
Allen Helm, III, Asst. Dist. Atty., Houma, for plaintiff and appellee State of La.
F. Smith Knobloch, Thibodaux, for defendant and appellant Juan Jose Sanchez.
*416 Before GROVER L. COVINGTON, C.J., and SHORTESS and SAVOIE, JJ.
SAVOIE, Judge.
Juan Jose Sanchez was charged by a single bill of information with (Count I) conspiracy to possess more than four hundred grams of cocaine, a controlled dangerous substance classified in Schedule II (LSA-R.S. 14:26 and 40:967 F), and (Count II) possession of more than four hundred grams of cocaine (LSA-R.S. 40:967 F). Defendant pled not guilty and filed a motion to suppress the seized contraband. Following a hearing, the trial court denied defendant's motion to suppress. Thereafter, defendant withdrew his former pleas of not guilty and pled guilty as charged in each count, reserving his right to appeal the adverse ruling on the motion to suppress. See State v. Crosby, 338 So.2d 584 (La. 1976). The trial court sentenced defendant to a seven and one-half year term of imprisonment at hard labor on Count I and to a fifteen year term of imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, on Count II. The two sentences are to be served concurrently.[1]
Defendant brings this appeal urging as his only assignment of error that the trial court erred by denying the motion to suppress.

FACTS
In December of 1985, Ken Perry, the general manager of Perry Flying Center, located in Patterson, Louisiana, rented a Piper Navajo airplane to Ray Howell. The airplane was owned by Mike Foster, but Perry was responsible for the operation and maintenance of the aircraft. Ken Perry testified that Howell represented that he had an opportunity to fly computer parts from New Orleans to Tampa, Florida, and needed an airplane to demonstrate to the company that transportation by air would be cost effective. Howell took possession of the aircraft on December 13, 1985. According to Ken Perry, the rental agreement, in part oral, provided that Howell return the airplane to Perry Flying Center every other day. In addition, Howell was to have use of the craft for a period not to exceed one week; also he was not to allow anyone else to pilot the aircraft.
During the week following Howell's possession of the aircraft, Ken Perry and his father, M.C. Perry, tried to locate Howell, who had failed to return the airplane for the scheduled inspections. Finally, on December 18, 1985, the Perrys spoke with Howell by telephone and informed him that it was imperative that he present the aircraft for inspection. Howell stated the aircraft had been detained, but he promised to present it for inspection. The Perrys, who had grown suspicious, asked if any unauthorized persons were piloting the aircraft. Howell assured them that no one other than himself was flying the airplane. Nothing more was heard about the airplane until the afternoon of December 21, 1985. Ray Howell's wife, who lived in Oklahoma, called the Perrys and informed them that her husband would be leaving Florida that day and would return the airplane by 6:00 p.m. By that point in time, the Perrys had decided to file a stolen plane report.
During the late afternoon of December 21, Ken Perry heard a radio transmission by a pilot utilizing the registration number of the Piper Navajo rented to Howell. That pilot requested an airport advisory and fuel from the Thibodaux, Louisiana, airport. Ken Perry contacted the pilot by private radio frequency and confirmed the registration number of the aircraft. Perry asked to speak with Ray Howell, and the pilot responded that Howell was not aboard. Mr. Perry identified himself as the owner of the aircraft and ordered the unidentified pilot to fly the airplane to the Perry Flying Center. The pilot did not respond. Ken Perry testified that he was *417 perplexed by the pilot's request for fuel from the Thibodaux Airport, since flight time from Thibodaux to Patterson is only ten minutes.
Concerned that the airplane rented to Howell was being used in a prohibited manner by unauthorized persons, Ken Perry and his father began calling all of the local airports in an effort to detain the airplane if it should land. Finally, through Brian Saunders, an air traffic controller at the Houma Airport, Ken Perry learned that the airplane was refueling at that facility. Saunders, who knew Ken Perry and recognized the aircraft, agreed to have the fuel truck block the craft's forward movement, after he was informed that it was in the possession of unauthorized persons. While the Perrys flew to the Houma Airport, Saunders telephoned the Houma Police Department and requested a unit to investigate the unauthorized use of the aircraft.
Officer Duplantis testified that he was dispatched to the Houma Airport to investigate the unauthorized use of an airplane. On the way to the airport, Duplantis observed two men, one Hispanic and the other a non-Hispanic Caucasian, walking west on Louisiana Highway 24. Duplantis reached the airport in two minutes or less and reported directly to Hammond's Air Service, a private aviation service company located at the airport. Two laborers for the air service told him that two men, one Spanish and the other white, got out of the disputed airplane and began walking toward Highway 24.
Duplantis quickly located the two men he had spotted moments earlier. When asked, each admitted that he had just come from Hammond's Air Service. Duplantis conducted a pat down and then transported the two men (later identified as Juan Jose Sanchez and Peter Hugh Taylor) back to the airport in his police car. At that point, Duplantis had not spoken with the Perrys and wanted all parties present in one location so the disputed rightful possession of the aircraft could be resolved.
The remainder of the investigation took place on the tarmac of the runway where the Piper Navajo was parked. When Duplantis returned with defendant and Taylor, he found the Perrys on the scene inspecting the aircraft. Ken Perry convinced Duplantis that defendant and Taylor were not authorized to use the airplane. Ken Perry asked the men for the key to the airplane, but defendant said the key was lost. However, Perry informed Duplantis that the two men must have the key, as the door to the aircraft could only be locked by use of a key. When Duplantis told Taylor, who identified himself as the pilot, to empty his pockets, defendant produced a key. Ken Perry testified that the oral discussion with defendant, Taylor and Officer Duplantis lasted approximately twenty minutes.
Ken Perry took the key, which defendant had handed to Duplantis, and opened the door of the airplane. He was immediately overcome by gasoline fumes emanating from the cabin of the aircraft. Extra fuel tanks had been installed and holes cut in the floorboard in violation of the rental agreement. The cabin's carpeting was saturated with fuel leaking into the airplane's interior. In addition, all of the airplane's logs and documents were missing. During the process of surveying the craft's interior, Ken Perry opened one of several sealed boxes. Inside a brown plastic pouch, he found a white powdery substance, which he suspected was cocaine. Officer Duplantis testified that he heard Ken Perry remark, "I can't believe they're hauling cocaine in my plane." Thereafter, the officer turned to defendant and Taylor and advised both men of their Miranda rights.
Duplantis then informed his shift supervisor, by portable radio, that an aircraft believed to be transporting a large quantity of cocaine was at the Houma Airport. The Chief of Detectives, Lt. Bill Null, was notified. He in turn summoned several detectives from the narcotics division of the Houma Police Department and requested assistance of the United States Customs Service and the Federal Drug Enforcement Administration.
Prior to searching the aircraft, Lt. Null contacted Thirty-second Judicial District Judge Baron Bourg. Judge Bourg testified that, after conferring with both Null *418 and M. C. Perry, he concluded that Perry had the authority to give Null consent to search the aircraft. Null obtained M. C. Perry's written consent, and a small quantity of the cocaine opened by Ken Perry was field tested by Customs Agent Mike Russell. After the field test, the officers began removing the boxes from the cabin of the aircraft and from the cargo compartment. The boxes were filled with squares of cocaine wrapped in plastic and weighing approximately one kilogram each. Approximately five hundred and fifty pounds of ninety-two percent pure cocaine were seized.
Defendant's attack on the motion to suppress first focuses on the initial seizure of defendant and Taylor by Officer Duplantis. Defendant contends that Duplantis arrested him without probable cause. Accordingly, all evidence seized subsequent to and as a direct result of his illegal arrest should have been suppressed by the trial court.[2]
Louisiana Code of Criminal Procedure article 215.1 authorizes a law enforcement officer to make an investigatory stop when he "reasonably suspects" that a person is committing, has committed, or is about to commit an offense. Inherent in an officer's right to stop an individual and to demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or to obtain information independently of his cooperation. State v. Fauria, 393 So. 2d 688 (La.1981).
The definition of arrest is keyed to the concept of restraint. State v. Marks, 337 So.2d 1177 (La.1976). An arrest occurs when circumstances indicate an intent to effect an extended restraint in the liberty of an accused, rather than at the precise time an officer tells an accused he is under arrest. State v. Commodore, 418 So.2d 1330 (La.1982). However, an investigatory stop is a complete restriction on liberty of movement for a time. A stopping for investigation is not a lesser intrusion because the restriction of movement is incomplete but, rather, because it is briefer than an arrest. See State v. Merchant, 490 So.2d 336 (La.App. 1st Cir.), writ denied, 496 So.2d 326 (La.1986).
Officer Duplantis maintained that he approached defendant and Taylor with the intent of detaining them until rightful control over the disputed aircraft was resolved. When questioned, the two men indicated that they had just come from the airport. This acknowledgement, which revealed a rather unusual departure from the airport by foot, coupled with the reported unauthorized use of the aircraft, served to intensify Officer Duplantis' suspicions. Bringing all parties at interest together in one location represented an investigative approach which was likely to confirm or dispel Duplantis' suspicions quickly. See United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
The Perrys were present at the airport parking lot when Duplantis returned with defendant and Taylor. Ken Perry immediately approached Duplantis and began explaining his relationship to the airplane and his recent search for its whereabouts. Perry also revealed how he was alerted to the airplane's presence in the area when he heard an unfamiliar voice using the craft's call numbers over the radio. After apparently crediting Perry's version of the events, Officer Duplantis' original suspicions, which had justified the initial detention, ripened into probable cause. He then helped the Perrys obtain the key needed to open the airplane's door.
*419 Officer Duplantis ordered Taylor, the airplane's pilot, to assume "a spread eagle" and was beginning a pat down when defendant pulled the key from his shirt pocket. Defendant argues that he produced the key in response to Officer Duplantis' attempted illegal search of Taylor. He reasons that all contraband seized from the interior of the airplane should have been suppressed because the key needed to open the door was obtained in a tainted manner. He does not contend that the key, itself, should have been suppressed.
In written reasons for denying the instant motion to suppress, the trial court noted: "The argument that the key to the aircraft was unlawfully seized is facetious; the aircraft would have been entered and searched with or without the key, because the Perrys were in the process of repossessing it." We agree.
In this case, the key was on the person of the defendant and would have been discovered once he was taken into custody on the unauthorized use of a movable charge. In addition, we are convinced, as was the trial court, that the Perrys would have gained entry into the airplane, with or without the use of the key. When the evidence in question would inevitably have been discovered without reference to a possible police error, there is no nexus sufficient to provide a taint and the evidence is admissible. See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
Ken Perry used the key offered by defendant and opened the door of the airplane. Once inside the craft, he opened a sealed carton, which contained cocaine. Defendant contends that Perry's initial search inside the airplane was illegal because of substantial and predominant government participation. We do not agree.
In this case, the trial court found that the instant search was conducted without official, governmental intrusion. That finding is supported by the record which clearly reveals that Ken Perry entered the aircraft on his own initiative and that the scope of the search was governed by Perry's concern for the safety of the aircraft.
As Perry entered the craft, he immediately noted substantial physical alterations made to the aircraft, which included the installation of auxiliary fuel tanks. Fuel had leaked from these tanks into the craft's interior and had saturated the cabin's carpeting. In addition, all of the airplane's documents and logs were missing. Perry testified that he opened a sealed carton, at least in part, because he feared that the unknown cargo might pose a hazard in the presence of the fuel.
The fourth amendment of the United States Constitution protects against unreasonable searches and seizures. This amendment has been interpreted to protect individuals from unreasonable governmental actions. Its primary purpose is to restrain governmental authorities. It is not intended to protect against private trespasses. See State v. Gentry, 462 So.2d 624 (La.1985), and cases cited therein.
The Louisiana Supreme Court has not declared to what extent La. Const. Art. 1, § 5 reaches further than the fourth amendment. However, in State v. Coleman, 466 So.2d 68 (La.App. 2d Cir.), writ denied, 467 So.2d 542 (La.1985), the Second Circuit interpreted that constitutional provision and found it inapplicable to private searches.
In several cases involving private searches, the Louisiana Supreme Court has found it unnecessary to consider the constitutional issue because the private search in each case was found reasonable. See, e.g., State v. Gentry, supra; State v. McCabe, 383 So.2d 380 (La.1980); State v. Abram, 353 So.2d 1019 (La.1977), cert. den., 441 U.S. 934, 99 S.Ct. 2058, 60 L.Ed.2d 663 (1979); and State v. Hutchinson, 349 So.2d 1252 (La.1977).
In the cited cases, the court referred to some of the same factors considered in police searches to determine the reasonableness. The court considered such factors as the defendant's subjective expectation of privacy, the reasonableness of that expectation, and the reasonableness of the citizen's suspicion that provoked the initial private search. In the instant case, Ken Perry acted reasonably. Any privacy *420 interest that defendant and Taylor may have had was clearly subordinated to Perry's concern for the safety of a very valuable piece of equipment in his care.
Once the private search by Ken Perry revealed the suspected contraband, the examination of that package by Officer Duplantis and United States Customs Agent Russel did not violate any legitimate expectations of privacy that would trigger a violation of the fourth amendment. See United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); State v. Gentry, supra.
At that point, the officers had probable cause to believe that the craft contained contraband and might then have conducted a search of the craft under the "automobile exception" of the fourth amendment warrant requirement. See State v. Merchant, 490 So.2d at 341, and cases cited therein. However, in order to buttress their right to search the craft, Lt. Null spoke by telephone with District Court Judge Baron Bourg. After conversing with Null and M.C. Perry, Judge Bourg determined that any need for a search warrant could be obviated by obtaining Perry's consent to search.
As his final attack on the denial of his motion to suppress, defendant contends that Perry lacked authority to consent to a search of the leased aircraft. We disagree.
Consent is one of the exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Littleton, 407 So.2d 1208 (La.1981). Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Bodley, 394 So.2d 584 (La.1981).
The fourth amendment doctrine on third party consent is not controlled by the law of property with its attendant and historical legal refinements. See United States v. Matlock, supra. In this instance, the Perrys were caretakers of the aircraft, with rights of possession and inspection delegated by the craft's owner. Their rental arrangement with Howell was very restrictive. They retained the right to fully inspect the airplane during the course of the agreement. Moreover, when the airplane was seized, the rental agreement and the limited possessory interest of Howell had already terminated.[3]
For the foregoing reasons, this assignment of error lacks merit. Defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] During the same Boykin examination defendant also pled guilty to one count of simple escape, charged by bill of information number 164073. The trial court sentenced defendant to a two year term of imprisonment to be served consecutively to the sentences imposed on the cocaine charges. Defendant directs the instant appeal only to the two counts charged by bill of information number 159643.
[2] Defendant also alludes to the fact that he and Taylor were approached by Duplantis outside the territorial boundaries of the City of Houma. In State v. Bickham, 404 So.2d 929 (La.1981), the Louisiana Supreme Court construed Louisiana Code of Criminal Procedure article 215.1 as authorizing an officer in close pursuit to leave his jurisdiction to make an investigatory stop, when, as herein, the officer initiated his pursuit for the purpose of stopping while within his jurisdiction. More significantly, the Louisiana Supreme Court rejected defendant's contention in Bickham that the remedy necessary for enforcement of the territorial jurisdiction rule is exclusion of reliable evidence produced as a result of arrests or stops initiated in good faith by an officer who began to act within his territorial limits.
[3] Defendant also complains of the trial court's failure to grant his motion for a continuance of the hearing on the motion to suppress. However, his qualified guilty plea reserved only the ruling on the motion to suppress, and the instant argument does not fall within the scope of the only assigned error. As a non-jurisdictional defect, the ruling on the motion for a continuance was waived by defendant's guilty plea. See State v. Crosby, supra. Moreover, defendant does not allege any specific prejudice. The time allowed for preparation was not so short as to be a basic denial of fairness. See State v. Durio, 371 So.2d 1158 (La.1979).