**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**MANAIA SIVA PEARSON, Defendant.**

High Court of American Samoa
Trial Division

CR No. 48-97

January 9, 1998

Before: KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, Frederick J. O'Brien, Assistant Attorney General
For Defendant, Loretta Townsend, Assistant Public Defender

## ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO DISMISS

### Introduction

Manaia Siva Pearson ("Pearson") is charged with Burglary in the First Degree (A.S.C.A. § 46.4030), Stealing (A.S.C.A. § 46.4103), Unlawful Use of a Weapon (A.S.C.A. § 46.4203), two counts of Possession of an Unlicensed Firearm (A.S.C.A. § 46.40221), and Assault in the First Degree (A.S.C.A. § 46.3520).

On October 23, 1997, Pearson filed a motion to suppress evidence, alleging constitutional violations of his rights and, on November 10, 1997, filed a motion to dismiss, alleging destruction of evidence. Pearson seeks to suppress evidence obtained from his cousin, Albert Pearson ("Albert"), evidence found on the premises of his aunt, Evalani Viena ("Viena"), as well as his own statements made during custodial interrogation at the police station in Fagatogo. This court consolidated and heard both Pearson's motions on November 25, 1997, with counsel for both sides present.

### Facts

On July 19, 1997 at about 4:17 a.m., a shooting at a house across the street from the High Court in Pago Pago was reported to police. Detective Richard Sua'ava of the Department of Public Safety ("DPS") investigated this incident and obtained information from Albert and others that Pearson had been involved in the shooting incident. Police also learned that Pearson had broken into and stolen several items from a Toyota pickup truck owned by Kuo Fu Sheng ("Sheng").

At about 6:00 a.m. on July 19, 1997, police brought a number of witnesses to the DPS station in Fagatogo for questioning. Officers were told that Pearson possessed ammunition, a .38 caliber revolver, and an M1 carbine. After learning that Albert had Pearson's .38 caliber revolver at his home, Captain Mageo directed Albert to bring the revolver back to

64

the station which Albert did.

Police officers then went to the Motu o Fiafiaga Motel ("Motel") at about 9:00 a.m. that same morning where they found Pearson asleep in the lobby. They took Pearson into custody and brought him to the Fagatogo station. After being given his *Miranda* warnings, Pearson admitted to Captain Fotu Leuta that he had broken into Sheng's pickup truck. Police officers went back to the Motel at about 11:00 a.m. that day and asked the owner, Viena, to search the outside grounds of the motel.[1] After Viena consented to this limited search, officers found Pearson's M1 carbine and sweater inside Viena's residence behind the motel, in a room later identified by Viena's daughter as belonging to Pearson.

### Discussion

A. Motion to Suppress Defendant's Statement

Pearson seeks to exclude the incriminating statement which he had made to Officer Leuta, about his breaking into a parked vehicle. Pearson claims that police violated his constitutional rights by failing to abide by the requirements of *Miranda*.[2]

■ The evidence revealed that prior to questioning by officer Sua`ava, officer Fotu Leuta had presented and read to Pearson, DPS's pre-printed form containing a largely verbatim recital of the *Miranda* warnings as

---

[1] Viena testified that she gave police permission to "look outside of my yard right next to the Motel and by the club, and that was all." That is, only "outside where I can see [the police]." She answered in the negative when asked by defense counsel whether she gave police permission to search her residence.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court held that:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.
>
> . . . [P]rior to any questioning, the [defendant] must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, that he has the right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently.

384 U.S. at 444

formulated by the Supreme Court. This form was also signed by Pearson in front of Officer Leuta. Pearson, however, argues that his *Miranda* waiver was defective because of his inebriated and fatigued condition. He claims that his state of intoxication and lack of sleep at the time impaired his senses to so great a degree that he was unable to "voluntarily, knowingly and intelligently" waive his rights as required under *Miranda. Miranda v. Arizona*, 384 U.S. 436 (1966). Because of his "fragile state," he claims that the burden should shift to the government to show a proper waiver of rights by the accused, a burden that Pearson contends was not met.

We disagree. The *Miranda* court suggests that the government should carry a "heavy" burden of proof to show a valid waiver of *Miranda* rights in certain instances when the rights of the accused may be jeopardized. *Id.* at 475. However even if burden-shifting were appropriate, the proper standard by which to judge the validity of the defendant's *Miranda* waiver is merely preponderance of evidence, the lowest standard and one that we find was easily met in this instance. *Colorado v. Connelly*, 479 U.S. 157 (1986). Here, the evidence shows that even though Pearson was under the influence of alcohol and sleep deprived, his state of mind was not fragile enough to nullify the validity of his waiver. During the questioning at the police station, he was capable of engaging in meaningful dialogue with the officers and had the presence of mind to immediately ask police to explain the reason for his detention. Pearson was able to tell us exactly which officers were at the station when he was taken in and testify in great detail about his conversation with the officers.[3] Indeed, his memory of the events surrounding his questioning seems astonishingly clear for someone who was, in his words, "pretty drunk," ostensibly too drunk to understand the extremely elemental rights

---

[3] Pearson's testimony on direct examination by Public Defender, Loretta Townsend, in which he relays his interchange with police may itself best underscore this point:

> I remember saying I didn't know what I was being brought in for. And I asked [the officer], "What was I brought in for?" And they had mentioned something about a shooting. And then I had told them, "I don't know of any shooting." And then they said, . . . "I should come clean and tell others the truth." . . . And they had said something along the lines, "You should feel remorse for what you had done." . . . And I said, "I really didn't know what they were talking about and how could I feel remorse for something I had no remorse for."

Question by Loretta Townsend:

> But you don't really recall making a statement about a burglary?

Pearson's response: "No I do not."

that *Miranda* affords and properly discharge them.

Even more curious than his ability to recall in minute detail the substance and chronology of his interaction with police is the diametric variance of his version of events with that of the police officers. It seems that when Pearson does not directly contradict the testimony of the officers, his memory fails him—inexplicably, conveniently, and completely. For example, he has lost all memory of signing the waiver form even when he had the essence of the waiver explained to him and his signature appears on the form.

In essence, Pearson claims that he would not have signed the form had he understood it and—so the argument goes—he was incapable of understanding the waiver when it was presented to him. We find his claim to be unable to knowingly, voluntarily and intelligently waive his rights to be simply unbelievable. Pearson struck us as a person of above average intelligence, a graduate of a top-ranked university. Moreover, nothing on the record exists to suggest overbearance or excessiveness on the part of the officers, much less any hint of coercion. The motion for suppression will, therefore, be denied.

B. Motion to Suppress M1 Carbine and Sweater

■ Even though police may have exceeded the bounds of Viena's consent to search her premises and thus may have violated Viena's constitutional rights, the violation of *Viena's* rights in this instance does not transmute to Pearson. *Alderman v. United States*, 394 U.S. 165, 174, (1969), holds that a Fourth Amendment right is a "personal right" which may not be vicariously asserted by another. The Supreme Court affirmed this position in *Rakas v. Illinois*, 439 U.S. 128 (1978), stating that "it is proper to permit only *defendants whose Fourth Amendment rights have been violated* to benefit from the rule's protections." *Id.* (emphasis added). Put another way, "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967).

■ This "personal right" may be asserted one of two ways: through a privacy right or a possessory interest. In the seminal Fourth Amendment case of *Katz*, Justice Harlan wrote that privacy rights attach only to those who have "an actual subjective expectation of privacy," one that "society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361; *see Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

In the alternative, the accused must hold a possessory interest in the area searched. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)(holding that the Fourth Amendment is implicated "when there is some meaningful interference with an individual's possessory interest in that

67

property.") *See also Boyd v. United States*, 116 U.S. 616, 630 (1886) (emphasizing the importance of property rights, holding that an "invasion of private property, be it ever so minute, is a trespass.") (quoting *Entick v. Carrington*, 19 How.St.Tr. 1029 (C.P. 1765). This court reiterated these doctrines in *American Samoa Government v. Atafua*, 1 A.S.R.3d 174, 175 (Trial Div. 1997), and *American Samoa Government v. Prince Dunham*, 1 A.S.R.3d 176, 177-78 (Trial Div. 1997), by holding that Article I, § 5 applies only to defendants who have a "legitimate expectation of privacy" or a "property or possessory interest."

■ Here, Pearson had neither a possessory right nor any other "reasonable and legitimate expectation of privacy" in the room where police discovered the sweater and M1 Carbine. The police found him sleeping in the motel lobby, not the room searched. Viena testified that Pearson did not stay at her residence on any regular or consistent basis. She had not known that Pearson had been on her premises, much less that he had slept there on the night in question. Instead, Albert, Pearson's "blood brother," testified that Pearson often stays at his house, coming over there "whenever he likes." Moreover, since Pearson apparently dropped off the sweater and M1 Carbine in one of the rooms and then went to sleep in the lobby, Pearson himself acted as if he subjectively knew that he did not have permission to stay inside Viena's home. All of these facts, singularly or combined, cast great doubt that Pearson held a possessory interest in the room where the evidence was found. Furthermore, Pearson's decision to sleep in an area open to many people, including at a minimum the guests of the motel and their guests, further leads us to believe that Pearson did not have a subjective and reasonable "expectation of privacy" as required under *Katz* for his Fourth Amendment protections to attach. *Katz v. United States*, 389 U.S. at 351, 19 L.Ed. at 582. In light of this evidence, we cannot suppress the evidence found by the police on Viena's premises.[4]

---

[4] We must note, however, that we look upon the actions of the police in this instance with great disfavor. The officers clearly exceeded the scope of Viena's consent. She gave permission to search the lobby and outside grounds of the motel, but not the inside of the building. If evidence had been found that implicated Viena in a crime, the improper conduct of the police would have compromised its admissibility. Accordingly, we would like to admonish and caution the officers involved here regarding the manner in which they carry out their duties. Overzealousness, no matter how well intentioned, can trample a citizen's fundamental rights and obviate the good it seeks to achieve, serving as a force counterproductive to its primary goals.

## C. Motion to Suppress .38 Caliber Revolver

■ No cognizable personal rights of Pearson were violated by Captain Mageo's command to Albert, a third party, to surrender Pearson's gun to police. Even if the rights of Albert were compromised, the rights of Pearson were not necessarily compromised. *See Id.; Rakas,* 439 U.S. at 131; *Alderman,* 394 U.S. at 174. Therefore, for the same reasons as discussed above, we deny defendant's motion to exclude the .38 caliber revolver.

## D. Motion to Dismiss

■ We find Pearson's contention that the obvious lies his allies told police should be considered "statements with exculpatory value" to be preposterous. These witnesses, defendant's friends and family, initially offered the police nothing more than categorical denials of the defendant's culpability in the charged crimes. The initial statements were apparently conflicting, confused, and consisting of very little, if any, truth.

As a matter of practice, we will concede that it is probably best that police retain any and all statements given them, however ludicrous, sketchy, and unhelpful such statements may be. But even if this were the optimal course of police conduct, we find defendant's assertion of a *Brady* violation in the case at hand to be utterly devoid of any legal substance or merit. *Brady v. Maryland,* 373 U.S. 83 (1963) (holding that suppression of evidence favorable to a defendant who has requested it violates due process where the evidence is material either to guilt or punishment). We do not see how the fabrications told to DPS rise to the level of *Brady* violations.

■ Defense goes on to argue, desperately we may add, that even if the witnesses' statements were not exculpatory, they have value as material for cross-examination. *See United States v. Bagley,* 473 U.S. 667 (1985) (extending the holding in *Brady* to evidence with cross-examination value). In fact, under the American Bar Association Model Rules of Professional Conduct (1984) ("Model Rule"), as adopted in this jurisdiction under High Court Rule 104 in 1993, counsel would be under an affirmative duty to withhold from or advise the court of any testimony or evidence which is known to be untruthful, whether intended for direct or cross examination. *See* American Bar Association Model Rules of Professional Conduct, Rule 3.3.[5] To do otherwise would mean "that the

---

[5] Rule 3.3 states, "When evidence that a lawyer knows to be false is provided by a person who is not a client, the lawyer must refuse to offer

lawyer cooperate in deceiving the court, thereby subverting the truth-finding process that the adversary system is designed to implement." *Id.*[6] Moreover, Model Rule 8.4 (d) states: "It is professional misconduct to engage in conduct that is prejudicial to the administration of justice."[7] Model Code DR 7-102(A)(6) requires that a lawyer shall not "participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false." Most of the substance of the statements initially presented to the police, therefore, could not have been admitted in court in the first place. Accordingly, and with no further discussion, we deny Pearson's ill-founded motion to dismiss.[8]

### Conclusion and Order

Defendant's motions are accordingly denied as provided herein.

It is so ordered.

---

it regardless of the client's wishes."

[6] Rule 1.2(d) states that "a lawyer shall not . . . engage or assist a client in conduct that the lawyer knows is criminal or fraudulent."

[7] Moreover, Model Code DR 1-102(A)(5) directs that a lawyer not "[e]ngage in conduct that is prejudicial to the administration of justice."

[8] Counsel would be well advised to take note that a violation of the Rules of Professional Conduct which govern the American Samoa Bar *will* result in disciplinary action against the attorney. Model Rule 8.4 (a) states: "It is professional misconduct to violate or attempt to violate the rules of professional conduct." *See* 155(a) HCR which incorporates Model Rule 8.4 (a) into this jurisdiction. We caution, therefore, that counsel think twice before treading this line again.