OPINION
Deborah K. McGinnis is appealing from the decision of the trial court finding her guilty of driving under the influence after she entered a no contest plea. She had also been originally charged with reckless operation, but that offense was dismissed by the court. Her appeal challenges the denial of her motion to suppress all evidence obtained by statements made by her to the officers and others at the scene of her traffic stop.
This case brings into question whether a citizen's arrest made pursuant to R.C. 2935.04 is an action of the state which, therefore, would allow the application of the exclusionary rule against illegal searches and seizures. In order to present the facts in this case, we will quote certain portions from the transcript of the hearing on the suppression motion, as follows:[1]
 TESTIMONY OF DRIVER OF THE CAR Q. OK, and do you recall where you were on August 28th, 1999 at approximately seven o'clock?
A. Yes.
Q. Where was that?
 A. I was leaving South Charleston, Route 41. I was on my way to my sister's house.
Q. Was there anything unusual about that trip?
A. Yes.
Q. What? Ma'am, can you please describe that?
 A. I was going down the road, I had my three kids with me and maybe a half mile past the 55 miles an hour sign, a car — a dark car came up on me. It was coming fast, I could tell and I was going the speed limit. And then as she got closer, I could tell she wasn't going to slow down and I had to go off the right side of the road. She did not get over to pass me. She was just going straight for me. If I had not ran off the road, she would have ran right into the back of me.
Q. OK, what happened after she passed you?
 A. I got back on the road and I followed to — followed her where she was going. She was going the same direction I was, but she stayed in front of me and for at least ten seconds, every ten seconds, she would drive on the other side of the lane for a long time and then she'd come back. She'd speed up, slow down. At first I thought maybe she was sick, on her way to the hospital. I didn't know, I just knew I was gonna stay behind her, no matter where she was going.
 Well, a couple cars had to go off the road. Then a car, a truck driven by . . . was coming towards us. Well, I seen him turn around. He got behind me and I slowed down `cause he motioned to get in front of me. Then he got in front of her and he was slowing — we got down to almost a standstill. She stopped in the middle of the road, then she started to go again and he kinda, kinda like veered her off this way in our lane. And then she stopped. And he got out of the truck and — as he got, he got to her first. Then when I got up there, he kept asking her to have her car keys.
 We didn't want her driving anywhere. We kept asking her, was she OK, and all she kept saying is that she was so sorry. That's all she just kept saying, that she was gonna lose her job. I didn't know who she was at the time, but then [truck driver] got her keys and someone with a cell phone came by and they called — I don't know if it was 9-1-1 or not. And first, it was the South Charleston police that was there. He was on his way back into town and he stayed there with us `til the Highway Patrol got there.
Q. Why did you continue to follow the Defendant?
 A. I don't know. She was, I didn't go off my path of where I was going. I just, I just gonna follow her wherever she went. She almost killed me and my kids. I had my three kids. I was on my way to Children's Hospital and I was just gonna follow her no matter where she was, to tell her, you almost killed me.
Tr. 18 — 20.
 TESTIMONY OF TRUCK DRIVER Q. And do you recall where you were on August 28th of this year?
A. Yes, I do.
 Q. OK, directing your attention to about seven o'clock that day, were you traveling then?
 A. I was thinking it was earlier than that, but, yes, I was.
Q. OK, did anything unusual happen?
 A. A car coming toward me was in the wrong lane, going very slow. At that time, I was getting ready to make a lefthand turn, and I actually had to go off the righthand side of the road to make that turn. And as the car passed me, I laid on my horn and no response from the driver or anything, and so I knew something was wrong, you know. She needed to be stopped or find out what was wrong with her, at least.
 So I turned around and tried to get her attention.
Q. OK, how did you try to get her attention?
 A. I caught back up with her a couple miles down the road, pulled up beside her, as I was gonna pass her and laid on the horn. Did anything I could to get her attention and never looked up at me or didn't even know I was there, you know. There was no response.
Q. So what did you do after this?
 A. I pulled in front of her and just started slowing down, little by little and finally we came to a stop in the middle of the road.
Q. OK, OK, and what did she do in response to this?
 A. She didn't get out. She didn't, you know, attempt to drive off or anything at that time. I asked her what was wrong and she said, "Nothing," that she had to go. And I told her that I couldn't let her drive that way. That's not the kind of person I am, you know. And she attempted to take off at that time and I reached in and turned the keys off, turned the car off.
Q. OK, why did you do all of this?
 A. Well, I'm a caring person. My family drives up and down that road too and I didn't want anything to happen to her or anybody else.
Tr. 24 — 26.
 CROSS-EXAMINATION OF TRUCK DRIVER Q. Um, you pull up next to Debbie, you honk your horn, you're not getting any response. You pull in front of her and slow down. Why?
A. She shouldn't have been on the road.
Q. You were trying to stop her?
A. Yes.
 Q. And you wanted to stop her from driving at all that day?
A. Yes.
 Q. When you got her to the side of the road, how easy was that? Did she try and get around you at all?
 A. There was no attempt to pass me or anything. There was one time where she accelerated and I thought she was gonna hit me in the back of the truck, but she ended up slowing down and finally came to a stop.
Tr. 28.
 TESTIMONY OF TROOPER LUCKETT Q. Thank you, trooper. Did you pull Miss, did you pull Debbie over?
A. No, sir.
 Q. When you arrived at the scene, how had she been pulled over?
 A. She was, she had been pulled over in what appeared to be a rolling roadblock.
Q. What's a rolling roadblock?
 A. It's where one car will get in front of, in this case, her vehicle and slowly slow down; and then the vehicle behind, behind her, kind of got closer so she couldn't really get around the — in this case, it was a pickup truck.
 Q. What is the point of a rolling roadblock, officer?
* * *
A. In order to stop the vehicle.
 Q. Is it fair to say it's to keep the vehicle from leaving wherever you want them to be?
A. It's fair to say that, yeah.
 Q. OK, when you arrived at the scene, you approached the car — Miss McGinnis's car. You say she was in the car.
A. Yes, sir.
Q. Did she have the keys with her?
A. No, sir.
Q. Where were the keys?
A. The keys were on top of the roof.
 Q. Had she placed them there? Did you know how they got there?
 A. In talking with one of the civilians, he stated that he had put them — he had taken them out of the car and put them on top of the roof.
Tr. 12 — 14.
 Q. Do you recall being dispatched to the area of State Route 41 near Newlove Road?
A. Yes, sir.
 Q. OK, do you recall what time that occurred? Approximately?
 A. I believe it was around 7 o'clock, a little after seven.
Q. OK, why were you dispatched there?
 A. We had a report of an individual who was driving erratically and was boxed in by a number of civilians.
Q. OK, what did you find upon arriving?
 A. That the dispatch was true. There was a pickup truck in front of one vehicle and then there was another vehicle behind, and they were in close proximity as to box the —
Q. Who was the driver of the vehicle in the middle?
A. It was the Defendant, Deborah McGinnis.
Tr. 5 — 6.
After Trooper Luckett arrived at the scene, he determined from all the evidence present, including roadside testing of the defendant, that she was under the influence and took her to the station. The question whether she was under the influence is not an issue in this appeal. The sole issue is whether the stop by the civilians is an action by the State which brings into play the exclusionary rule. The trial court dealt with this issue in its decision and entry overruling the motion to suppress as follows:
 This matter came on for hearing on Defendant's Motion to Suppress evidence based on a citizen's arrest that violates Defendant's State and Federal Constitutional rights., Defendant claims that the citizens involved were state actors that effected a rolling roadblock and essentially arrested Defendant by detaining her until a State Trooper arrived.
 The State claims that actions by private citizens cannot be ascribed to the State. Further the actions of the citizens in this case do not constitute an arrest and finally no violation of constitutional rights occurred which would trigger the application of the so-called exclusionary rule.
 Based on a review of the evidence presented, as well as a consideration of the supplemental memoranda filed by counsel, the Court finds as follows:
 That an arrest of Defendant was effected by the citizens involved in this case. Defendant was gradually forced from the roadway and detained by the citizens who confiscated her car keys while awaiting the arrival of the State Trooper.
 The question for this Court is whether or not such an arrest rises to the level of an unconstitutional seizure of the Defendant so as to require the suppression of any and all evidence obtained subsequent to the stop.
 This determination hinges on whether or not there is prohibited governmental action involved — since both the federal and state Constitutions protect citizens against certain acts of the State.
In United States v. Jacobsen (1984),104 S.Ct. 1652, 1656 as cited in the State's brief, the Supreme Court determined
 The first Clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated . . ." This text protects against two types of expectations, one involving searches, the other seizures . . . This Court has consistently construed this protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation of knowledge of any governmental official.
The State also cites State v. Droste 83 Ohio State 3d at 40 in which the Ohio Supreme Court noted:
 "We have stated on many occasions that absent a violation of a constitutional right, the violation of a statute does not invoke the exclusionary rule."
Applying the reasoning and holdings of the above cases to the facts of this case, the Court finds that the citizens involved in this case acted as private citizens pursuant, albeit inappropriately, to Ohio Revised Code section 2935.04, et seq. Acting as private citizens, their actions cannot be attributed to the State. Therefore the Court finds that there is no State action present in this case that would trigger the application of the exclusionary rule pursuant to the State and Federal Constitutional protections against illegal searches and/or seizures., Defendant's motion is overruled.
Docket 70 — 72.
We agree with the trial court's decision and adopt it as part of this opinion and decision. In fact, the question has already been definitively answered in this district. State v. Ingram
(June 14, 1993), Montgomery App. No. 13508, unreported. Ingram
involved a citizen's arrest by an armed private security guard of a suspicious person on the premises who it turned out was armed. Just as in the matter before us, the defendant in Ingram filed a motion to suppress, which the trial court overruled finding that the security guard was a private citizen, and the defendant could not claim his Fourth Amendment rights were violated because there was no "State action." On appeal, this court affirmed, saying: "The Fourth Amendment limits official government behavior and it does not regulate private conduct. Courts have routinely declined to exclude evidence which were obtained by private persons." (Citations omitted). We decline to overrule our decision inIngram. The sole assignment of error is overruled.
 _____________________ FAIN, J.
GRADY, P.J. and YOUNG, J. concur.
[1] We will not use the actual names of the two witnesses we will quote from in order to avoid them unnecessary embarrassment.